In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00079-CV
______________________________


W. L. DIXON AND A. W. WITCHER, Appellants
Â 
V.
Â 
DAVID DEWHURST, TEXAS LAND COMMISSIONER, ET AL., Appellees


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 115th Judicial District Court
Upshur County, Texas
Trial Court No. 400-00


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Â Â A vacancy is "an area of unsurveyed public school land . . . ." Tex. Nat. Res. Code Ann.
Â§ 51.172(5) (Vernon Supp. 2004â2005); see Cockerell v. Taylor County, 814 S.W.2d 892, 894 n.2
(Tex. App.âEastland 1991, writ denied). A person discovering that a vacancy exists has the right,
in certain circumstances, to lease or purchase the property at a price fixed by the proper state agency. 
W.Â L. Dixon and A.Â W. Witcher (collectively Dixon) claimed a vacancy existed concerning land in
Upshur County and attempted to purchase or lease the alleged fifty-four-acre vacancy. Dixon later
lowered the claim for vacant land to thirty-five acres, but eventually claimed that the vacancy had
to be one of the two acreages.


 The proceeding went to the General Land Office, which had a survey
made of the land, and concluded a vacancy existed. The case was tried before an administrative law
judge, who determined that no vacancy existed, and that proposal was adopted by the Commissioner
of the General Land Office. Dixon appealed to the district court, and that court affirmed the
Commissioner's order. Dixon appeals.
Â Â Â Â Â Â Â Â Â Â Â Â In determining whether there was substantial evidence to conclude no vacancy existed, a 
primary issue is whether the administrative law judge could properly consider any evidence except
the senior (William King) and junior (David Meredith) surveys in determining, on the ground, the
location of the Meredith survey's south border in relation to the King survey. Dixon urges that a
vacancy exists concerning property allegedly located south of the common boundary line of the
S.Â W. Beasley and the Meredith surveys and north of the King survey. The Meredith survey did not
call to adjoin the King survey. In fact, the Meredith survey did not even mention or acknowledge
the King survey. 
Â Â Â Â Â Â Â Â Â Â Â Â However, the Beasley survey and other evidence indicate that they do adjoin. If this 
evidence could not be considered, then there was no evidence before the Commissioner to support
the ruling; if it could be considered, there is.
Standard of Review
Â Â Â Â Â Â Â Â Â Â Â Â Our review is extremely protective of the agency's decision and the trial court's review of that
decision. The Act of May 28, 1993, 73rd Leg., R.S., ch. 991, Â§ 1, 1973 Tex. Gen. Laws 4323
requires the trial court to review the Commissioner's ruling to see if it is supported by substantial
evidence. Thus, we look to see if the trial court correctly decided that such substantial evidence
exists.


 
Â Â Â Â Â Â Â Â Â Â Â Â The Administrative Procedure Act (APA) authorizes a reviewing court to test an agency's
findings, inferences, conclusions, and decisions to determine whether they are reasonably supported
by substantial evidence considering the reliable and probative evidence in the record as a whole. 
Tex. Gov't Code Ann. Â§ 2001.174(2)(E) (Vernon 2000). The cases applying that standard presume
that the Board's order is supported by substantial evidence and that the plaintiff has the burden to
overcome this presumption. See Meier Infiniti Co. v. Motor Vehicle Bd., 918 S.W.2d 95, 98 (Tex.
App.âAustin 1996, writ denied). Further, the evidence in the record may preponderate against the
decision of the agency and nevertheless amount to substantial evidence. Tex. Health Facilities
Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984); Graff Chevrolet Co.
v. Tex. Motor Vehicle Bd., 60 S.W.3d 154, 159 (Tex. App.âAustin 2001, pet. denied). 
Â Â Â Â Â Â Â Â Â Â Â Â Substantial evidence is more than a scintilla and is enough relevant evidence that a
reasonable mind could come to the same conclusion. Firemen's and Policemen's Civil Serv. Comm'n
v. Brinkmeyer, 662 S.W.2d 953 (Tex. 1984). A reviewing court may not simply substitute its
judgment for that of the administrative body. City of Dallas v. Hamilton, 132 S.W.3d 632, 637 (Tex.
App.âEastland 2004, pet. denied); see Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, 436
(1946). An administrative order will not be set aside merely because evidence was conflicting or
disputed or because the evidence did not compel the result reached by the agency. Substantial
evidence deals only with the reasonableness of the administrative order, not with its correctness; a
reviewing court may not set aside the order simply because it would have reached a different
conclusion. Brinkmeyer, 662 S.W.2d at 956. Thus, the true test is not whether the agency reached
the correct conclusionâbut whether some reasonable basis exists in the record for the agency's
action. City of El Paso v. Pub. Util. Comm'n of Tex., 883 S.W.2d 179 (Tex. 1994). 
Issue
Â Â Â Â Â Â Â Â Â Â Â Â Dixon argues that a portion of the land between the Meredith and the King surveys is vacant
and unpatented, and presents the following arguments: 
Â Â Â Â Â Â Â Â Â Â Â Â (1) the Meredith survey and the King survey are complete on their faces,
Â Â Â Â Â Â Â Â Â Â Â Â (2) Meredith, as the junior survey of the two, does not specifically say that it adjoins the King
survey's north boundary,
Â Â Â Â Â Â Â Â Â Â Â Â (3) the corner monument of the Meredith survey could not be found,
Â Â Â Â Â Â Â Â Â Â Â Â (4) the distance measured on the Meredith survey's west boundary is not long enough from
the set point to reach the north boundary of the King survey. Dixon's contention that he has proven
the existence of the vacancy is necessarily based on his position that no other surveys or factors
should be considered.
Â Â Â Â Â Â Â Â Â Â Â Â The conclusion that a vacancy exists comes from utilizing known starting points and then by
following course and distance calls to the north boundary line of the King survey and the south
boundary lines of the Meredith and Beasley surveys. When the boundary lines do not meet using
those measurements, considering that evidence only, necessarily a portion of the land is vacant. In
arriving at the conclusion that a vacancy exists, Dixon's survey ran out the boundary from known
starting points. (The north boundary of the King survey was established from a known southeast
corner of the King survey. The south boundary of the Meredith survey was established from the
northwest corner of the John W. Rogers survey. The south boundary of the Beasley survey is located
beginning from the Meredith survey's southwest corner, which was also established from the Rogers
survey's northwest corner.) (See diagram.) 
Â Â Â Â Â Â Â Â Â Â Â Â In the Beasley survey, which is junior to the King survey, several calls stated clearly that the
Beasley and Meredith surveys adjoined the north boundary line of the King survey. (E.g., the
southeast corner of the Beasley survey calls to be in the north boundary line of the King survey [see
diagram label number 1], the southeast corner of the Beasley survey calls for the same trees as the
southwest corner of the Meredith survey [number 2], the south boundary line of the Beasley survey
calls to be in the north boundary line of the King, the southwest corner of the Beasley survey calls
for the same trees as the southeast corner of the Manning survey [number 3], and the southeast
corner of the Manning survey calls to be in the north boundary line of the King survey [number 4]. 
The Controlling Concept
Â Â Â Â Â Â Â Â Â Â Â Â The ultimate function of these rules is to determine the true and correct location of the land. 
Stafford v. King, 30 Tex. 257, 272 (1867). Although a junior survey cannot be used to create an
ambiguity in or change the location of a senior survey, Kirby Lumber Corp. v. Lindsey, 455 S.W.2d
733, 739 (Tex. 1970), if the original boundaries in a senior survey have disappeared, recitals in a
junior survey may be used to determine its location. Hill v. Whiteside, 749 S.W.2d 144, 152 (Tex.
App.âFort Worth 1988, writ denied). The purpose of the rule is to make a junior survey conform
to the boundaries of an adjoining senior survey and thus avoid a vacancy or conflict. We also note
that, if, because of a lapse of time since the making of a senior survey, the original senior survey
bounds have disappeared, recitals in the junior survey are the best evidence of the location of those
senior survey boundaries. Id.; see Waldrop v. Manning, 507 S.W.2d 626, 630 (Tex. Civ.
App.âTexarkana 1973), writ ref'd n.r.e. per curiam, Manning v. King, 514 S.W.2d 899 (Tex. 1974). 
We also recognize that these concepts are by no means limited to purely the two surveys presently
at issueâthey extend to the other surveys surrounding them, each of which is junior or senior to its
neighbor. See Hill, 749 S.W.2d at 152â53.
Dixon's Surveyor:
Â Â Â Â Â Â Â Â Â Â Â Â Garey Gilley testified there is a vacancy because the Meredith survey does not call to adjoin
to the north line of the King survey, because the original monument described as the corner for the
Meredith survey could not be found, and because the measurement from the calculated northwest
corner did not reach down to the north line of the King survey.



Defendants' Surveyor: 
Â Â Â Â Â Â Â Â Â Â Â Â Darrell Shine testified there is no vacancy, based on his on-the-ground survey and his review
of numerous written records, ranging from the various surveys to the Upshur County records and
field books of Stanolind Oil dating from the 1930s and 1940s.
Â Â Â Â Â Â Â Â Â Â Â Â He agreed the original boundaries (monuments) have disappeared since the mid-1800s, and
thus he used recitals in the Beasley survey to locate its common corner with the senior Meredith
survey. Specifically, the southeast corner of the Beasley survey (which is junior to the Meredith
survey) specified that its corner was identified by the same trees as those found on the southwest
corner of the Meredith surveyâand that they were located in the north boundary line of the King
survey. Both the Beasley and Meredith surveys were done by surveyor J. M. Glasco. 
Â Â Â Â Â Â Â Â Â Â Â Â Shine also relied on the Manning survey, which is senior to the Meredith survey (though
junior to the King survey), and which placed its southeast corner on the King survey's north
boundary lineâand specified that this corner was at the same trees as the Beasley southwest corner. 
Â Â Â Â Â Â Â Â Â Â Â Â The surveyor also located the Mann survey (which adjoins the east boundary of the King
survey, and adjoins part of the south boundary of the Meredith survey) and noted that the field notes
for the Mann survey placed the southeast corner of the Meredith survey due east of the northeast
corner of the King survey, thus placing that corner in the south boundary line of the Meredith survey. 
Could the Commissioner look at anything more than the King and Meredith surveys?



Â Â Â Â Â Â Â Â Â Â Â Â It is clear that the underlying purpose of retracing the original surveyor's footsteps is to
determine that original surveyor's intent. Strong v. Delhi-Taylor Oil Corp., 405 S.W.2d 351, 376
(Tex. Civ. App.âCorpus Christi 1966, writ ref'd n.r.e.). Where conflict exists, the concept of
"dignity" of calls is used to show what calls will control. 31 Tex. Admin. Code Â§ 7.5 (1976);



Stafford, 30 Tex. 257; Cherokee Water Co. v. Freeman, 145 S.W.3d 809, 814 n.3 (Tex.
App.âTexarkana 2004, pet. denied). Typically, to avoid the vacancy problem between two
"adjoining" tracts of land, the survey will call to adjoin to the next survey. Also, it is clear that the
oldest survey is given priority, with the newer ones subject to the older. Thus, as stated above, 
junior surveys cannot create ambiguity in the calls or change the location of a senior survey. 
Lindsey, 455 S.W.2d at 739; Knupp v. Miller, 858 S.W.2d 945, 949 (Tex. App.âBeaumont 1993,
writ denied).
Â Â Â Â Â Â Â Â Â Â Â Â In addition, the Meredith and Beasley surveys, both of which are just north of the King
survey, were done by the same surveyor, and there is also authority holding that, where there is a
conflict or uncertainty between two surveys made by the same surveyor, it is (1) appropriate to
consider extrinsic evidence to resolve the conflict, Taylor v. Higgins Oil & Fuel Co., 2 S.W.2d 288,
301 (Tex. Civ. App.âBeaumont 1928, no writ); and (2) calls in a junior survey can be considered
in locating the boundaries of the senior when both were made by the same surveyor within a short
period of time. Magnolia Petroleum Co. v. Biel, 285 S.W.2d 858, 864 (Tex. Civ. App.âSan
Antonio 1955, writ ref'd n.r.e.); see Barnes v. Wingate, 342 S.W.2d 352, 357 (Tex. Civ.
App.âBeaumont 1960, writ dism'd). The administrative law judge also acknowledged the Meredith
survey was completed by Glasco in 1851 and did not contain a call to adjoin the King survey, or even
mention the King survey whereas the Beasley survey was completed by Glasco in 1871 and
contained three calls for the Beasley survey to adjoin the King survey. The administrative law judge
recognized that Glasco had conducted several surveys in the area since 1851 and that it was
reasonable to infer that, when Glasco surveyed the Beasley tract, he was more familiar with the area
and the King survey. 
Â Â Â Â Â Â Â Â Â Â Â Â The Commissioner also considered a number of other factors relevant and persuasive, such
as the location of old fence lines on the supposed joint boundary that was detailed by Stanolind Oil
survey crews in the 1930s and 1940s and which fence lines still exist today. 
Conclusions
Â Â Â Â Â Â Â Â Â Â Â Â The Commissioner could, under the restrictions set out by the rules above, consider evidence
other than that provided only by the King and Meredith surveys. The Beasley survey, as junior to
the Meredith survey, could not be utilized to change the Meredith survey's lines. However, because
the Beasley survey specifies that its southeast corner was memorialized by the same trees as was the
southwest corner of Meredith, it could be considered to provide some evidence of where that
memorialized corner was on the ground. Because the trees had disappeared over the last l50 years,
the statement in the Beasley survey specifying that the trees were on the King survey's north
boundary could also be considered as evidence. There was also evidence that an
earlierâunpatentedâsurvey sharing the same southwest corner with the Meredith survey identified
the same trees and specifically did place them in the King boundary line.


 
Â Â Â Â Â Â Â Â Â Â Â Â There is also authority providing the use of extrinsic evidence when none of the original
corners can be located on the ground because time has destroyed the evidence left by the original
surveyor. Taylor, 2 S.W.2d at 300. In this case, even under Dixon's formulation, none of the
original corners of the Meredith survey were located. Dixon's starting point lies in the northwest
corner of the Rogers survey, calculates distance and course south and east to find a corner that was
in common with the northeast corner of the Meredith survey. 
Â Â Â Â Â Â Â Â Â Â Â Â The inconsistency is the shortfall in surveyor Gilley's measured line (1820 varas, as opposed
to the 1925 varas required from the calculated Meredith survey corner to actually reach the north
boundary of the King survey [at 33-1/3 inches per vara, that is about 291 feet off out of a total
distance of 5,342 feet]). Although by twenty-first century standards such a distance is considerable,
in a case contemporary with the surveys the Texas Supreme Court found that a descriptive call of
3,160 varas was a mistake, a true length of only 750 varas existed, that this was not highly
exceptional, and discussed the reasons that distance measurements are of such low integrity. See
Stafford, 30 Tex. at 275â76.
Â Â Â Â Â Â Â Â Â Â Â Â Under the substantial-evidence standard, it does not appear the trial court erred by concluding
that the administrative decision was made with the support of applicable legal authority. Further,
under the standards stated in this opinion, there was substantial evidence presented supporting the
decision of the administrative body. 
Â Â Â Â Â Â Â Â Â Â Â Â We affirm the judgment of the trial court.
Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Â 
Date Submitted:Â Â Â Â Â Â Â Â Â Â June 16, 2005
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â August 4, 2005



   Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Opinion by Chief Justice Morriss








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  O P I N I O N

Â 

Â Â Â Â Â Â Â Â Â Â Â  During
Desmond Dewayne JacksonÂs six-day jury trial for capital murder arising from a
robbery and shooting of Melvin Brad Mitchell in the parking lot outside Cash
America Pawn in Longview, the State spent approximately two and a half days, on
rebuttal, providing evidence that, as an extraneous offense, Jackson committed
an armed robbery of a Kroger grocery store in Marshall approximately a month
after the charged murder.Â  Though the
State does not claim that the Kroger robbery is so similar to the pawn shop
murder as to be a ÂsignatureÂ crime, it maintains that proof of the Kroger
robbery was admissible to prove identity or intent or to rebut a defensive
theory.

Â Â Â Â Â Â Â Â Â Â Â  Jackson
appeals his conviction and sentence of life imprisonment without parole,
raising thirteen issues.Â  We reverse
JacksonÂs conviction and remand for a new trial, because we hold that, although
(1) the evidence is legally and factually sufficient, (2)Â admitting
evidence of the Kroger robbery was reversible error.[1]

(1)Â Â Â Â Â Â Â  The Evidence Is Legally
and Factually Sufficient

Â Â Â Â Â Â Â Â Â Â Â  A
person commits capital murder if he or she intentionally commits murder while
in the course of committing or attempting to commit robbery. Â Tex.
Penal Code Ann. Â§Â§ 19.02(b)(1), 19.03(a)(2), 29.02 (Vernon 2003).Â  Jackson claims the State failed to prove he was
involved in the crime and failed to prove the requisite intent.

Â Â Â Â Â Â Â Â Â Â Â  In
reviewing the legal sufficiency of the evidence, we view all of the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.Â  Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

Â Â Â Â Â Â Â Â Â Â Â  In
a factual sufficiency review, we review all the evidence, but do so in a
neutral light and determine whether the evidence supporting the verdict is so
weak or is so outweighed by the great weight and preponderance of the evidence
that the juryÂs verdict is clearly wrong or manifestly unjust.Â  Lancon v. State, 253 S.W.3d 699, 705
(Tex. Crim. App. 2008); Roberts v. State,
220 S.W.3d 521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404,
414Â15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d 126, 134
(Tex. Crim. App. 1996).

Â Â Â Â Â Â Â Â Â Â Â  The
State presented sufficient evidence for a reasonable jury to conclude, beyond a
reasonable doubt, that Jackson was guilty.

Â Â Â Â Â Â Â Â Â Â Â  On
the morning of Monday, December 10, 2007, Mitchell, an employee of the pawn
shop, arrived at the bank to make a number of deposits and with a change order
of $400.00 for MondayÂs business.Â  Due to
an error in FridayÂs deposit, the bank sent Mitchell back to the pawn shop with
FridayÂs deposit.Â  Mitchell left the bank
with approximately $8,884.00.Â  After
Mitchell had parked his truck, but before he entered the store with the bank
bag,[2]
Mitchell was robbed and shot. 

Â Â Â Â Â Â Â Â Â Â Â  Three
witnesses to the shooting testified at trial.Â 
While leaving a nearby grocery store with her friend, Maria Hernandez,
Tammy Renee Flores saw a man run from the front of the pawn shop, hit the
pickup truck which set off the truckÂs alarm, run between the Plasma Center and
the retaining wall, and then run up the hill beside the E-Z Mart, a convenience
store.Â  Flores testified she did not
think anything out of the ordinary had occurred and proceeded to a nearby ÂSpanish
store on Green Street.ÂÂ  Upon leaving the
store on Green Street, Flores observed police cars at the pawn shop and stopped
to report her observations.Â  

Â Â Â Â Â Â Â Â Â Â Â  Hernandez
testified she heard screaming and then saw a man running with a gun in his hand.Â  

Â Â Â Â Â Â Â Â Â Â Â  Walter,
who was cleaning a State Farm Insurance office located across the street Âat an
angle,Â observed Mitchell go to the door of the pawn shop, enter the pawn shop,
come back out, and go to the side of the building.Â  Walter then observed an African-American
person wearing a Âred hoodieÂ run from behind the Plasma Center across the
parking lot, observed the person stop in the parking lot Âmaybe just a second,Â
and then heard a gunshot.Â  After the
gunshot, Walter observed the person run behind the building in the same
direction the person had come from.Â 
Walter was unable to tell whether the person was a male or female.Â  

Â Â Â Â Â Â Â Â Â Â Â  Cyrus
Dean, the manager of the pawn shop, heard some shouting outside the shop and
went to the front window to look out.Â  Dean
observed Mitchell lying on the ground between his parked truck and the
building.Â  The alarm on MitchellÂs pickup
truck had been activated.Â  Thinking
Mitchell may have fallen, Dean rushed to MitchellÂs side and discovered
Mitchell had been shot.Â  Mitchell told
Dean that he had been shot by Âa tall, slender black dude wearing a red top.ÂÂ  While Dean and Mitchell were waiting on the
ambulance, Mitchell also expressed a concern that, if the paramedics did not
get there soon, he was going to die.Â  

Â Â Â Â Â Â Â Â Â Â Â  Officer
Danny Stroud, a police officer with the Longview Police Department, arrived at
the scene a few minutes before the ambulance.Â 
Stroud testified Mitchell appeared to be scared and kept saying, ÂPlease
hurry.Â  Please hurry.Â  It hurts.ÂÂ 
Mitchell informed Stroud that the man who shot him had come from behind
the dumpsters. 

Â Â Â Â Â Â Â Â Â Â Â  Dr.
Keith Pinckard, a medical examiner for Southwestern Institute of Forensic
Sciences, testified Mitchell died from a gunshot wound to the chest.Â  

Â Â Â Â Â Â Â Â Â Â Â  Officer
Kirby DeLoach, a police officer with the Longview Police Department, tracked
the suspect with a certified tracking dog.Â 
The tracking dog lost the scent in a parking lot of a church located at
Birdsong and Baxter Avenues.Â  DeLoach
noticed a spot of water in the parking lot of the church consistent with a spot
of water created by a carÂs air conditioning unit.Â  DeLoach presumed that the suspect got into a
car in the church parking lot.Â  

Â Â Â Â Â Â Â Â Â Â Â  Within
hours of the robbery, Cash America Pawn offered a $20,000.00 reward for Âinformation
leading to the arrest and indictment of the individual(s) responsible for the
robbery/murder of Melvin ÂBradÂ Mitchell.ÂÂ 
On or about January 18, Detective Douglas Brinkley, a detective with the
Criminal Investigation Division of the Longview Police Department, received a
call from Ladarian Beechum.Â  Beechum
informed Brinkley that her brother, Robert Blaylock, had some information for
him concerning the pawn shop robbery.Â 
Brinkley interviewed Blaylock, who lived in Atlanta, Georgia, by
telephone and then traveled to Atlanta to interview Blaylock in person.Â  Shortly before Christmas, while Jackson and
Blaylock were drinking and playing a video game, Jackson admitted to Blaylock
that Jackson had killed a man with a Â.45.ÂÂ 
Blaylock denied being drunk.Â 
According to Blaylock, Jackson stated he knew the guyÂs routine of going
to the bank in the morning and returning with money for the day.Â  Jackson stated he stole approximately $8,000.00
and had fled through some woods.Â 
Blaylock admitted he had received the $20,000.00 reward from Cash
America Pawn. Â Blaylock also admitted he
had previously lied under oath about his finances on an application for a
court-appointed attorney.Â  

Â Â Â Â Â Â Â Â Â Â Â  James
Roberson, JacksonÂs accomplice in the Kroger robbery, testified Jackson
admitted that Â[h]e robbed a guy, and he [had] shot himÂ because Â[h]e wouldnÂt
give him the money.ÂÂ  Roberson testified
he could not remember the details other than the victim was an older white
man.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
Longview police searched JacksonÂs house a total of three times.Â  The first search was conducted pursuant to
the consent of Francis Jackson, JacksonÂs wife.Â 
During the search, the police seized a .32 caliber pistol, a .45 caliber
automatic pistol, a box of .45 caliber Federal brand shells, twenty rounds of .45
caliber Blazer brand shells, and nine rounds of .45 caliber Remington brand
shells.Â  The second search was conducted
pursuant to search warrant.Â  The third
search was conducted based on the consent of Lanie Smith, who had accepted a
deed to the house in lieu of foreclosure.[3]Â  During this search, the police seized a .45
caliber Remington brand shell casing, which was found on the ground behind an
air conditioning unit.Â  

Â Â Â Â Â Â Â Â Â Â Â  An
analysis of the items seized provided a few links between the items and the pawn
shop murder.Â  Wade Thomas, a forensic
scientist for the Texas Department of Public Safety, testified that StateÂs
Exhibit #19B, a shell found at the scene of MitchellÂs murder, and StateÂs
Exhibit #30, the shell found in the third search of JacksonÂs house, were fired
from the same gun.Â  However, Thomas
testified that tests to determine whether the shells were fired by the .45
caliber pistol seized at JacksonÂs house were inconclusive.[4]Â  Thomas testified the shells seized at JacksonÂs
house had similar bunting markings as the shells found at the scene, supporting
the conclusion that they were probably made at or near the same time.Â  Thomas admitted on cross-examination that the
same machine could make between 40,000 and 180,000 shells with the same bunting
marks. 

Â Â Â Â Â Â Â Â Â Â Â  The
State introduced business records from Delta Airlines which indicate Jackson
flew from Atlanta to Dallas December 6, 2007, and returned to Atlanta December
11, 2007.Â  In addition to the plane
flights, the State presented evidence that Jackson had lied to the police about
his whereabouts on the day of the crime,[5] and
JacksonÂs wife had some poorly explained absences from work on the day of the
crime.[6]Â  Blaylock testified Jackson claimed to have
called his wife to pick him up.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
evidence is legally sufficient.Â  ÂBecause it is difficult to prove what a
defendant was thinking, intent of the accused is not ordinarily determined by
direct proof; rather, it is inferred from circumstantial evidence.ÂÂ  Morris v. State, 892 S.W.2d 205, 207
(Tex. App.ÂTexarkana 1994, no pet.).Â  ÂIntent
may be inferred from acts, words, or conduct of an accused, including the
circumstances surrounding the acts in which the accused engages.ÂÂ  Id.Â 
Considering the evidence in the light most favorable to the verdict, a
rational trier of fact could have found, beyond a reasonable doubt, the
essential elements of capital murder.

Â Â Â Â Â Â Â Â Â Â Â  Jackson
did present some contrary evidence.Â 
Ernest, JacksonÂs expert, testified the .45 caliber pistol seized at
JacksonÂs residence did not fire the shells contained in StateÂs Exhibits #19B
and #30.Â  Ernest testified, Â[I]tÂs my
opinion that this particular gun is making an entirely different set of markings
than these two cartridge cases . . . .ÂÂ 
The shell found in the third search should have been exposed to the
elements since it was found outside close to the air conditioner.Â  Ernest testified the shell seized in the
third search was Âbright and shinyÂ and does not appear to have Âany corrosion
to it, doesnÂt have any significant weathering to it.Â Â Ernest also testified there were a few grains
of sand (Âbut not muchÂ) on the inside of the shell and it did not appear to
have been cleaned in any significant manner.Â 
Ernest conducted a test to determine whether the weathering on the shell
was consistent with being exposed to the elements.[7]Â  Based on this test, Ernest opined that the
shell could not have been exposed to the elements for more than three
days.Â  The State recalled Thomas, who
testified he had cleaned the dirt off the shell with water and a cotton swab,
but admitted the shell did not have any apparent corrosion.Â  At trial and on appeal, Jackson argues the
condition of the shell casing indicates it may have been planted by some
unknown third party.

Â Â Â Â Â Â Â Â Â Â Â  James
Stewart, a friend of Mitchell, testified he overheard a conversation at a gas
station which made him believe the men might know something about the
murder.Â  The conversation was between a
heavyset black man and a tall, skinny, black man who was about 5Â9Â and had a
tattoo on his left upper forearm.Â  Stewart
later picked out a man named Bruce Kelly from a photographic lineup.Â  Naomi Martinez, a co-worker of Francis,
testified she received a telephone call from Francis around 9:00 a.m. and the
background noise sounded like what one would hear in a store like Super 1 or
Wal-Mart.[8]Â  

Â Â Â Â Â Â Â Â Â Â Â  The
evidence is factually sufficient.Â  The evidence supporting the conviction is not
Âtoo weakÂ to support the juryÂs verdict and the juryÂs verdict is not against
the great weight and preponderance of the evidence.[9]

(2)Â Â Â Â Â Â Â  Admitting
Evidence of the Kroger Robbery Was Reversible Error

Â Â Â Â Â Â Â Â Â Â Â  Jackson claims the trial court erred
in admitting evidence concerning an extraneous offense.Â  We agree.

Â Â Â Â Â Â Â Â Â Â Â  The
trial court admitted extensive evidence concerning the Kroger robbery,
including more than two days of additional testimony.Â  The State argues the extraneous offense was
admissible to prove identity, to prove intent, or to rebut a defensive theory.

Â Â Â Â Â Â Â Â Â Â Â  The
Texas Rules of Evidence provide the basic framework of our analysis on the
issue of whether an extraneous offense is admissible.Â  Evidence is ÂrelevantÂ that has Âany tendency
to make the existence of any fact that is of consequence to the determination
of the action more probable or less probable than it would be without the evidence.Â
Â Tex.
R. Evid. 401.Â  ÂAll relevant
evidence is admissible, except as otherwise provided by . . . these rules . . .
. Â [E]vidence which is not relevant is
inadmissible.ÂÂ  Tex. R. Evid. 402.Â 
Rule 404 provides: Â Âevidence of
other crimes, wrongs or acts is not admissible to prove the character of a
person in order to show that he acted in conformity therewith.ÂÂ  Tex.
R. Evid. 404(b).Â  Evidence of Âother
crimes, wrongs or actsÂ may be admissible if it has relevance apart from its
tendency Âto prove the character of a person in order to show action in
conformity therewith.ÂÂ  Tex. R. Evid. 404(b).

Â Â Â Â Â Â Â Â Â Â Â  TheÂ  permissible ÂpurposesÂ to which evidence of Âcrimes,
wrongs, or actsÂ may be put include Âproof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident.ÂÂ  Tex.
R. Evid. 404(b).Â  Extraneous-offense
evidence that logically serves any of these purposes is ÂrelevantÂ beyond its
tendency Âto prove the character of a person in order to show action in conformity
therewithÂ and subject only to the trial courtÂs discretion nevertheless to
exclude it Âif its probative value is substantially outweighed by the danger of
unfair prejudiceÂ .Â .Â .Â .Â Â Tex. R.
Evid. 403, 404(b).Â  

Â Â Â Â Â Â Â Â Â Â Â  An
accused must be tried only for the offense with which he or she is
charged.Â  The accused may not be tried
for a collateral crime or for being a criminal generally.Â  Stafford v. State, 813 S.W.2d 503, 506 (Tex. Crim.
App. 1991).

Generally, evidence of extraneous offenses may not
be used against the accused in a criminal trial . . . .Â  While such evidence will almost always have
probative value, it forces the defendant to defend himself against uncharged
crimes as well as the charged offense, and encourages the jury to convict a
defendant based upon his bad character, rather than proof of the specific crime
charged.

Â 

Daggett v. State, 187 S.W.3d 444, 450Â51 (Tex. Crim. App. 2005) (footnotes
omitted).Â  ÂRule 404(b) sets out an
illustrative, not exhaustive, list of exceptions to the prohibition against
admitting evidence of extraneous offenses including Âproof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident.ÂÂÂ  Id. at 451 n.13 (citing Tex. R. Evid. 404(b)).Â  Extraneous-offense evidence is admissible
only if the evidence satisfies a two-pronged test: Â (1) the extraneous-offense evidence must be
relevant to a fact of consequence in the case aside from its tendency to show
action in conformity with character; and (2) the probative value of the evidence
must not be substantially outweighed by the danger of unfair prejudice.Â  Page v.
State, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).Â  Unfair prejudice does not arise from the mere
fact that evidence injures a partyÂs case.Â 
Unfair prejudice may result from the tendency of the evidence to prove
some adverse fact not properly in issue or unfairly to excite emotions against
the defendant.Â  Casey v. State, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

Â Â Â Â Â Â Â Â Â Â Â  A
trial courtÂs decision to admit or exclude evidence is reviewed under an abuse
of discretion standard.Â  McDonald v. State, 179 S.W.3d 571, 576
(Tex. Crim. App. 2005); Willover v. State,
70 S.W.3d 841, 845 (Tex. Crim. App. 2002).Â 
A trial court does not abuse its discretion so long as the decision to
admit evidence is within the Âzone of reasonable disagreement.ÂÂ  Montgomery
v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on rehÂg).Â  An appeals court may not substitute its own
decision for that of the trial court.Â  Moses v. State, 105 S.W.3d 622, 627
(Tex. Crim. App. 2003).

Â Â Â Â Â Â Â Â Â Â Â  We
will address each of the StateÂs arguments and then, since we find the
extraneous-offense evidence was erroneously admitted, address whether the error
resulted in harm.

Â Â Â Â Â Â Â Â Â Â Â  (a)Â Â Â Â Â Â Â  The Extraneous-Offense Evidence

Â Â Â Â Â Â Â Â Â Â Â  After Jackson rested, the State
offered rebuttal evidence concerning the extraneous offense at issueÂthe Kroger
robbery.Â  In an effort transcribed onto
almost 250 pages of reporterÂs record, fifteen witnesses testified concerning
the extraneous offense, extending the trial an additional two and a half
days.Â  In addition, the State offered
approximately seventeen additional exhibits, including video and audio
recordings of police interrogations which were admitted into evidence.Â  And, we note, the vast majority of that
Kroger robbery evidence was presented after a weekend break and in the same
week the jury deliberated and rendered its verdict.

Â Â Â Â Â Â Â Â Â Â Â  Detective
Brinkley testified that Blaylock had provided him with information concerning
another crime in which Jackson had been involvedÂthe robbery of a Kroger
grocery store in Marshall, Texas.Â 
Blaylock testified Jackson had claimed the Kroger robbery Âwas an inside
deal with some guy that worked there, a manager.ÂÂ  According to Blaylock, Jackson admitted to wearing
a wig and acting like a shopper.Â  When
Blaylock showed Jackson a video recording of the robbery that had been posted
on the internet, Jackson referred to the gun in the video and said, Â[T]hatÂs
my baby; thatÂs that forty-five.ÂÂ 
Jackson told Blaylock he had stolen $17,000.00 and it had been split
three ways.Â  

Â Â Â Â Â Â Â Â Â Â Â  Helen
Baird, an employee of Kroger, testified she and Roberson were robbed by two
armed men who came into the cash room of the Kroger.Â  Baird, though, was not asked to make an
in-court identification of Jackson.Â  The
State recalled Roberson, who testified he was JacksonÂs accomplice in the
Kroger robbery.Â  Roberson described how
he and Jackson planned and executed the robbery.Â  Roberson testified Jackson provided him with
approximately $3,500.00 for his share of the stolen cash.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
State also presented scientific evidence linking Jackson to the Kroger
robbery.Â  Thomas, the StateÂs firearm
expert, was recalled and testified that shell casings collected by the Marshall
Police Department at the scene of the Kroger robbery were fired from the .45
caliber pistol seized at JacksonÂs house.Â 
Constance Patton, a forensic scientist from the Tarrant County Medical
Examiner laboratory, testified a hat recovered at the scene of the Kroger
robbery had a mixture of DNA from three men on it.Â  Jackson could not be excluded as a possible
contributor of the DNA.Â  Patton testified
Â99.98 percent of random unrelated individuals in the Caucasian,
African-American, and Southwestern Hispanic populations would be excluded as
possible contributors to the ball cap mixture.ÂÂ 


Â Â Â Â Â Â Â Â Â Â Â  (b)Â Â Â Â Â Â Â  Similarity of Offenses

Â Â Â Â Â Â Â Â Â Â Â  When the extraneous offense is
introduced to prove identity, the extraneous offense must be so similar to the
charged offense that the offenses illustrate the defendantÂs Âdistinctive and
idiosyncratic manner of committing criminal acts.ÂÂ  Martin
v. State, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005); see Owens v. State, 827
S.W.2d 911, 914 (Tex. Crim. App. 1992).Â 
The common characteristics of each offense must be so unusual as to act
as the defendantÂs Âsignature.ÂÂ  Taylor v. State, 920 S.W.2d 319, 322
(Tex. Crim. App. 1996).Â  ÂNo rigid rules
dictate what constitutes sufficient similarities; rather, the common
characteristics may be proximity in time and place, mode of commission of the
crimes, the personÂs dress, or any other elements which mark both crimes as
having been committed by the same person.ÂÂ 
Segundo v. State, 270 S.W.3d
79, 88 (Tex. Crim. App. 2008).Â  ÂUsually,
it is the accretion of small, sometimes individually insignificant, details
that marks each crime as the handiwork or modus
operandi of a single individual.ÂÂ  Id.Â 
In the context of evaluating the admissibility of extraneous offenses, modus operandi refers to Âa defendantÂs
distinctive and idiosyncratic manner of committing criminal acts.ÂÂ  Owens,
827 S.W.2d at 914.

Â Â Â Â Â Â Â Â Â Â Â  In
Hartsfield, this Court held an
extraneous offense was admissible to prove identity when the offenses occurred
in the same geographic area, were committed three days apart and at night, were
committed with accomplices, and the perpetrators first emptied the cash
register and then rifled through the shelves beneath the cash register at both
locations.Â  Hartsfield v. State, 305 S.W.3d 859, 872 (Tex. App.ÂTexarkana 2010,
pet. filed).Â  Hartsfield, though, is distinguishable from the current case.Â  The Kroger robbery occurred inside the store
by two persons with a third accomplice who worked at the store.Â  The pawn shop murder was committed in the
parking lot of the pawn shop by a single person without any inside
accomplice.Â  The clothing of the suspects
differed.Â  The suspects in the Kroger
robbery wore wigs and disguises, while the sole suspect in the pawn shop murder
did not.[10]Â  The pawn shop murder and the Kroger robbery
were committed a month apart, rather than the three days between the offenses
in Hartsfield. 

Â Â Â Â Â Â Â Â Â Â Â  In
essence, the only similarities between the pawn shop murder and the Kroger
robbery are that both offenses were armed robberies committed with a .45
caliber pistol.Â  The State has failed to
direct this Court to any details, insignificant or otherwise, which would mark
the crime as the modus operandi of a
single individual.Â  The mere fact that
both offenses were armed robberies does not make them sufficiently similar to
prove identity.Â  ÂThe State must show
more than the mere repeated commission of crimes of the same type or class . .
. .ÂÂ  Owens,
827 S.W.2d at 915.Â  We see no similarities
that indicate a distinctive and idiosyncratic manner of committing criminal
acts.Â  Evidence concerning the Kroger
robbery was not relevant to the issue of identity.Â  As stated by the Texas Court of Criminal
Appeals: Â Âif extraneous offense evidence
is not ÂrelevantÂ apart from supporting an inference of Âcharacter conformity,Â
it is absolutely inadmissible under Rule 404(b).ÂÂ  Montgomery,
810 S.W.2d at 386Â87.Â  This decision is
outside the zone of reasonable disagreement.Â 
The trial court abused its discretion in admitting the evidence of the
Kroger robbery to prove identity.

Â Â Â Â Â Â Â Â Â Â Â  (c)Â Â Â Â Â Â Â  Proving Intent?

Â Â Â Â Â Â Â Â Â Â Â  Although the extraneous-offense
evidence was not admissible on the issue of identity, we must still consider
whether the extraneous evidence was admissible to establish intent.Â  Intent can be inferred from acts, words, and
conduct of the accused.Â  Hernandez v. State, 819 S.W.2d 806, 810
(Tex. Crim. App. 1991).Â  The State argues
the extraneous offense was admissible to establish Jackson had the requisite
intent.Â  The State claims the extraneous
offense shows Jackson intended to kill Mitchell because Mitchell resisted and
no one was killed at the Kroger robbery where no one resisted.

Â Â Â Â Â Â Â Â Â Â Â  Jackson
argues the defense Ânever put intent at issue.ÂÂ 
We agree.Â  During the trial,
Jackson never contested or attempted to refute the StateÂs evidence concerning
intent.Â  JacksonÂs defensive theory was
that the State failed to prove he was the person who committed the crime.Â  The only evidence which would contest intent
was the testimony of Blaylock, that Jackson said killing Mitchell ÂwasnÂt
something that I was trying to do, but, you know, I didnÂt have no choice.ÂÂ  BlaylockÂs testimony was introduced by the
State on direct examination.

Â Â Â Â Â Â Â Â Â Â Â  The
State argues Jackson contested intent by discussing the intent requirement
during voir dire.Â  We are not persuaded
by this argument.Â  Jackson did not
contest intent by discussing the issue during voir dire.Â  The State has failed to direct this Court to
where in the record Jackson placed intent at issue.Â  When the StateÂs evidence on intent Âis
uncontradicted by the defendant or not undermined by cross-examination of the
StateÂs witnesses, the offer of other crimes is unjustified due to the lack of
relevancy.ÂÂ  Rankin v. State, 974 S.W.2d 707, 719 (Tex. Crim. App. 1996) (op. on
rehÂg); DeLeon v. State, 77 S.W.3d
300, 312 (Tex. App.ÂAustin 2001, pet. refÂd).Â 
Because Jackson never contested intent, the extraneous-offense evidence
was inadmissible under Rule 404.Â  See Tex.
R. Evid. 404.Â  

Â Â Â Â Â Â Â Â Â Â Â  Even
if Jackson had contested intent, the probative value of the offense is
substantially outweighed by the danger of unfair prejudice.Â  See
Tex. R. Evid. 403.Â  Our analysis is guided by the following
factors known as the Montgomery
factors: Â (1) how compellingly the extraneous-offense
evidence serves to make a fact of consequence more or less probable; (2) the
potential the other offense evidence has to impress the jury Âin some
irrational but nevertheless indelible wayÂ; (3) the time the proponent will
need to develop the evidence, during which the jury will be distracted from
consideration of the indicted offense; and (4) the force of the proponentÂs
need for this evidence to prove a fact of consequence, that is, does the
proponent have other probative evidence available to him or her to help
establish this fact, and is this fact related to an issue in dispute. Montgomery, 810 S.W.2d at 389Â90; see Wheeler
v. State, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); Hartsfield, 305 S.W.3d at 873.

Â Â Â Â Â Â Â Â Â Â Â  The
first factor weighs slightly against the admission of the extraneous
offense.Â  The State argues the Kroger
robbery is probative of intent in the pawn shop murder because no one died in
the Kroger robbery where no one resisted.Â 
The State argues that Mitchell resisted in the pawn shop robbery and,
therefore, the Kroger robbery establishes that the actor intended to cause the
death of Mitchell during the pawn shop robbery.Â 
While this argument has some logic, the argument is extremely
tenuous.Â  It requires a rather large
inference to be made by the jury.Â  The
probative value of the Kroger robbery concerning intent is, at best, extremely
marginal.Â  Thus, the Kroger robbery is
not terribly compelling in making a fact of consequence more or less probable.

Â Â Â Â Â Â Â Â Â Â Â  The
second factor weighs heavily against the admission of the extraneous offense.Â  Although the extraneous-offense evidence was
accompanied by an instruction of its limitations, the evidence had to impress
the jury Âin some irrational but nevertheless indelible way.ÂÂ  While all extraneous offenses are inherently
prejudicial, we believe this extraneous offense is unusually prejudicial.Â  Rule 403 does not exclude all prejudicial
evidence, but only evidence where the probative value is substantially
outweighed by the danger of unfair prejudice.Â 
The Kroger robbery had significant potential Âto lure the factfinder
into declaring guilt on a ground different from proof specific to the offense
charged.ÂÂ  See Old Chief v. United
States, 519 U.S. 172, 180 (1997).Â 
The jury was presented with evidence that Jackson committed a second
armed robbery approximately a month after the pawn shop murder.Â  Thus, the Kroger robbery had substantial
potential to convince the jury that Jackson was a criminal in general and,
therefore, probably committed the charged offense.

Â Â Â Â Â Â Â Â Â Â Â  The
third factor weighs heavily against the admission of the extraneous
offense.Â  The time needed to develop the
evidence was substantial.Â  The StateÂs
rebuttal consumed approximately two and a half days of a six-day trial.Â Â  The State called fifteen witnesses and
introduced seventeen exhibits.Â  During
this entire time, the jury was distracted from consideration of the indicted
offense.

Â Â Â Â Â Â Â Â Â Â Â  The
remaining factor also weighs heavily against the admission of the extraneous-offense
evidence to prove intent.Â  As noted
above, intent was not a significant dispute at trialÂif it was even disputed at
all.Â  A jury could reasonably infer
intent from the evidence introduced concerning the pawn shop murder.Â  In essence, the State had no need for this
evidence to prove a fact of consequence.

Â Â Â Â Â Â Â Â Â Â Â  All
of the factors weigh against the admission of the extraneous-offense evidence
to prove intent.Â  Three of these factors
weigh heavily against its admission.Â  The
State had no need for the evidence to prove intent, the time needed to develop
the evidence was substantial, and the evidence had significant potential to
impress the jury Âin some irrational but nevertheless indelible way.ÂÂ  Even if the evidence was relevant, the
probative value of the offense is substantially outweighed by the danger of
unfair prejudice.Â  This decision is
outside the zone of reasonable disagreement.Â 
The trial court abused its discretion in admitting the evidence of the
Kroger robbery to prove intent.

Â Â Â Â Â Â Â Â Â Â Â  (d)Â Â Â Â Â Â Â  Rebutting a Defensive Theory Is Not in Issue

Â Â Â Â Â Â Â Â Â Â Â  The
State alternatively argues the extraneous offense was admissible to rebut
defensive theories.[11]Â  The trial court, though, instructed the jury
it could not consider the extraneous evidence:

FOR ANY PURPOSE UNLESS YOU FIND BEYOND A
REASONABLE DOUBT THAT THE DEFENDANT COMMITTED SUCH OTHER OFFENSES, IF ANY WERE
COMMITTED, AND EVEN THEN YOU MAY ONLY CONSIDER SUCH EVIDENCE IN DETERMINING THE INTENT OR THE IDENTITY OF THE
DEFENDANT IN RELATION TO THE OFFENSE ON TRIAL, AND YOU MAY NOT CONSIDER THESE
OFFENSES FOR ANY OTHER PURPOSE.

Â 

(Emphasis added.)Â  The Texas Court of Criminal Appeals has held
that an appellate court cannot affirm a trial courtÂs decision to admit
extraneous-offense evidence to rebut a defensive theory if the trial court
failed to instruct the jury, in the trial courtÂs limiting instruction, on the
extraneous evidence admissibility to rebut a defensive theory.Â  Owens,
827 S.W.2d at 917; see Curtis v. State, 89 S.W.3d 163, 171
(Tex. App.ÂFort Worth 2002, pet. refÂd) (refusing to consider whether admission
of extraneous-offense evidence to rebut defensive theory was proper because
jury was not instructed on that basis).Â 
The Texas Court of Criminal Appeals held, Â[a]bsent such additional
instruction, there is no way for an appellate court to know whether the jury
properly applied the evidence of appellantÂs ÂsystemÂ to rebut the weight or
credibility of appellantÂs Âframe-upÂ theory or relied on it for an improper
basis such as character conformity.ÂÂ  Owens, 827 S.W.2d at 917.Â  Here, the jury was not instructed that it
could consider the extraneous-offense evidence to rebut a defensive
theory.Â  As such, we cannot consider
whether the extraneous-offense evidence was admissible to rebut a defensive
theory.Â  The trial court erred in
admitting the evidence concerning the Kroger robbery.

Â Â Â Â Â Â Â Â Â Â Â  (e)Â Â Â Â Â Â Â  Harm

Â Â Â Â Â Â Â Â Â Â Â  The next step in our analysis is to
determine whether the error resulted in harm.Â 
Error in admitting evidence concerning extraneous offenses is reviewed
under Rule 44.2(b) of the Texas Rules of Appellate Procedure.Â  Casey
v. State, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (finding under Rule
44.2(b) the error in admitting photographs was harmless).Â  Rule 44.2(b) provides that an appellate court
must disregard a nonconstitutional error that does not affect a criminal
defendantÂs Âsubstantial rights.ÂÂ  Tex. R. App. P. 44.2(b).Â  An error affects a substantial right of the
defendant when the error has a substantial and injurious effect or influence in
determining the juryÂs verdict.Â  King v. State, 953 S.W.2d 266, 271 (Tex.
Crim. App. 1997).Â  A criminal conviction
will not be reversed for nonconstitutional error if the appellate court, after
examining the record as a whole, Âhas fair assurance that the error did not
influence the jury, or had but a slight effect.Â[12]Â  Johnson
v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); see Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

In assessing the likelihood that the juryÂs
decision was adversely affected by the error, the appellate court should consider
everything in the record, including any testimony or physical evidence admitted
for the juryÂs consideration, the nature of the evidence supporting the
verdict, the character of the alleged error and how it might be considered in
connection with other evidence in the case. Â The reviewing court might also consider the
jury instruction given by the trial judge, the StateÂs theory and any defensive
theories, closing arguments and even voir dire, if material to appellantÂs
claim.

Â 

Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); see Motilla,
78 S.W.3d at 355.

Â Â Â Â Â Â Â Â Â Â Â  The
State argued at oral argument that the error was harmless because the trial
court gave a limiting instruction before the State presented the extraneous-offense
evidence and the courtÂs instructions to the jury contained a limiting
instruction.Â  We are not convinced that
the limiting instruction rendered the error harmless.

Â Â Â Â Â Â Â Â Â Â Â  The
Amarillo Court of Appeals addressed a similar argument in Bjorgaard v. State, 220 S.W.3d 555, 562 (Tex. App.ÂAmarillo 2007), pet. dismÂd, improvidently granted, 253 S.W.3d 661 (Tex. Crim. App.
2008).Â  In that case, the appellant was
charged with attempted sexual assault of his ten-year-old niece. Â Id.
at 558.Â  The State introduced evidence
that the appellant had previously been convicted of indecency with a
child.Â  Id.Â  After determining the
evidence should not have been admitted, the Amarillo court concluded that, even
Âif the jury did heed the trial courtÂs admonishment, the admonishment itself
could be viewed as permitting consideration of the evidence for an improper
purpose.ÂÂ  Id. at 562.Â  As discussed
above, the Kroger robbery should not have been admitted to prove either
identity or intent in the pawn shop murder.Â 
Thus, the limiting instruction instructed the jury it could consider,
albeit for a limited purpose, evidence it should not have considered.Â  An instruction, which instructs a jury to
consider inadmissible evidence for a limited purpose, still instructs a jury to
consider inadmissible evidence.Â  The
evidence should not have been considered for any purpose during the guilt/innocence
phase of the trial.Â  The limiting
instruction does not render the error harmless.

Â Â Â Â Â Â Â Â Â Â Â  In
conducting a harm analysis, the presence of overwhelming evidence of guilt can
be a factor in the evaluation of harmless error.Â  Motilla,
78 S.W.3d at 357.Â  Jackson admitted to
Blaylock that he had committed the pawn shop murder.Â  Jackson admitted to Blaylock that he had
studied the victimÂs routine of going to the bank in the morning and returning
with money and that he had killed the man with a Â.45.ÂÂ  Jackson stated he stole approximately $8,000.00
and had fled through some woods.Â 
Roberson testified Jackson admitted Â[h]e robbed a guy, and he [had]
shot himÂ because Â[h]e wouldnÂt give him the money.ÂÂ  Shells seized during the first search of
JacksonÂs house had similar bunting markings as the shells found at the
scene.Â  Jackson flew from Atlanta to
Dallas December 6, 2007, and returned to Atlanta December 11, 2007.Â  JacksonÂs wife had some poorly explained
absences from work on the day of the crime.Â 
Jackson lied to the police on a number of occasions concerning his
whereabouts on the day of the crime.Â 
Last, the shell casing found during the third search of JacksonÂs house
was fired from the same gun as a shell casing found at the scene of the pawn
shop murder.Â  Although there is
substantial evidence of guilt, the evidence is not overwhelming.Â  The evidence of guilt weighs in favor of a
finding that the error did not influence the jury, but is not the sole factor
in our analysis.

Â Â Â Â Â Â Â Â Â Â Â  The
Texas Court of Criminal Appeals has stressed Âan appellate court should
consider overwhelming evidence of guilt, but that that should be only one
factor in the analysis.ÂÂ  Id. at 357.Â  Other relevant factors in a harm analysis are
ÂÂthe character of the alleged error and how it might be considered in
connection with other evidence in the case.ÂÂÂ 
Id. at 359 (quoting Morales, 32
S.W.3d at 867).

Â Â Â Â Â Â Â Â Â Â Â  The
character of the erroneously-admitted evidence weighs heavily in favor of a
finding of harm.Â  ÂExtraneous-offense
evidence is Âinherently prejudicial, tends to confuse the issues, and forces
the accused to defend himself against charges not part of the present case
against him.ÂÂÂ  Sims v. State, 273 S.W.3d 291, 294Â95 (Tex. Crim. App. 2008)
(quoting Pollard v. State, 255 S.W.3d
184, 185 (Tex. App.ÂSan Antonio 2008), affÂd,
277 S.W.3d 25 (Tex. Crim. App. 2009)).Â 
By its very nature, an improperly admitted extraneous offense tends to
be harmful.Â  It encourages a jury to base
its decisions on character conformity, rather than evidence that the defendant
committed the offense with which he or she has been charged.

Â Â Â Â Â Â Â Â Â Â Â  The
evidence that Jackson committed the Kroger robbery was overwhelming.Â  Roberson provided detailed testimony
concerning the Kroger robbery.Â  Jackson
had admitted committing the Kroger robbery to Blaylock.Â  The shell casings collected at the scene of
the Kroger robbery were fired from the pistol seized at JacksonÂs house.Â  A hat recovered at the scene of the Kroger
robbery after being abandoned by the robbers had a mixture of DNA from three
men on it.Â  Jackson could not be excluded
as a possible contributor of the DNA despite the fact that Â99.98 percent of
random unrelated individuals in the Caucasian, African-American, and
Southwestern Hispanic populationsÂ would be excluded as possible
contributors.Â  The overwhelming evidence
of the Kroger robbery had enormous potential for confusing the jury and
enormous potential to encourage the jury to base its decision on character conformity.

Â Â Â Â Â Â Â Â Â Â Â  Our
concerns about the nature of the erroneously admitted extraneous evidence are
enhanced when the evidence is considered in connection with the other evidence
in the case.Â  Although evidence suggests Jackson
committed the pawn shop robbery, it was not without contradiction.Â  The evidence establishing identity consisted
of mainly the shell casing found at JacksonÂs residence and the admissions
Jackson made to Blaylock and Roberson.Â 
The credibility of both Blaylock and Roberson was challenged by Jackson.Â  Blaylock admitted he had received the $20,000.00
reward and admitted he had previously lied under oath about his finances on an
application for a court-appointed attorney.Â 
Roberson was JacksonÂs accomplice in the Kroger robbery.Â  Jackson also argued that the shell found at
JacksonÂs house during the third search may have been planted by an unknown
third party.

Â Â Â Â Â Â Â Â Â Â Â  The
evidence of the Kroger robbery may have had a profound effect on the juryÂs
decision concerning the credibility of Blaylock and Roberson.Â  It is not our role to speculate as to whether
the jury would have still believed Blaylock and Roberson.Â  Credibility choices are the sole province of
the jury.Â  Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).Â  Our role is to determine the Âlikelihood that
the error materially affected the juryÂs deliberations.ÂÂ  McCarthy
v. State, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001) (citing Satterwhite v. Texas, 486 U.S. 249
(1988)).Â  The overwhelming evidence that
Jackson committed the Kroger robbery may have quieted any lingering doubts the
jury had concerning the credibility of Blaylock and Roberson.Â  The extraneous-offense evidence may have had
a significant influence on the jury when it was considering the credibility of
the StateÂs witnesses.

Â Â Â Â Â Â Â Â Â Â Â  In
considering how the erroneously admitted evidence might be considered in
connection with other evidence in the case, the emphasis of the evidence by the
State should be considered.Â  See Lajoie v. State, 237 S.W.3d 345, 355
(Tex. App.ÂFort Worth 2007, no pet.) (StateÂs overt emphasis contributed to
harm of admitting defendantÂs request for counsel); see also McCarthy, 65 S.W.3d at 55 (considering StateÂs emphasis of
error in assessing harm under Rule 44.2(a)).Â 
Unlike the erroneously admitted evidence in Motilla, the erroneously admitted evidence in this case is not
innocuous and is not brief.Â  The StateÂs
rebuttal consumed approximately forty percent of the trialÂapproximately two
and a half days of a six-day trial, and the bulk of that occurring after a
weekend break.Â  The State called fifteen
witnesses and introduced seventeen exhibits.Â 
The evidence linking Jackson to the Kroger robbery was considerably
stronger than the evidence linking Jackson to the pawn shop murder.Â  The State emphasized the extraneous offense
during its closing argument and admitted it had Âspent a significant time . . .
talking about an extraneous matter.ÂÂ 
Although the State generally referred to the extraneous offense when discussing
identity and intent, the State deviated from these limitations on at least one
occasion.Â  The State argued Jackson would
not have convinced Roberson to participate in the Kroger robbery Âif Mr.
Jackson isnÂt able to convince him that heÂs already gotten away with one.ÂÂ  Although the StateÂs emphasis was not as
overt as the emphasis in Lajoie, it
nonetheless affects whether the error resulted in harm.

Â Â Â Â Â Â Â Â Â Â Â  As
noted above, the evidence of guilt, while substantial, was not
overwhelming.Â  Even more important, the
evidence of guilt was not free from contradictions.Â  When the character of the erroneously
admitted evidence and its connection to the other evidence is considered, we
are unable to reach a fair assurance that the error did not influence the jury,
or had but a slight effect.Â  We conclude
the trial error in admitting evidence concerning an extraneous offenseÂthe
Kroger robberyÂresulted in reversible error.Â 
Because we have found the error in admitting the extraneous offense
constitutes reversible error, it is unnecessary to address JacksonÂs remaining
issues.

Â Â Â Â Â Â Â Â Â Â Â  Although the evidence is legally and
factually sufficient, admitting, over JacksonÂs objections, extensive evidence
concerning the extraneous offense was error and was harmful.Â  We reverse JacksonÂs conviction for capital
murder and remand for a new trial.

Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  June 30, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  August 12, 2010

Â 

Publish











[1]Because
we conclude the error in admitting the extraneous-offense evidence was
reversible error, it is not necessary to address JacksonÂs remaining issues.





[2]All
of the witnesses except Ruth Walter testified Mitchell had not entered the pawn
shop.Â  Walter, though, testified Mitchell
had entered the shop and then returned to the parking lot.





[3]The
Jacksons had purchased the home from Smith, a Longview police officer.Â  The home was owner financed by Smith and the
Jacksons gave Smith a deed to the home in lieu of foreclosure.Â  Smith then consented to the third
search.Â  Smith testified that he did not
participate in the investigation and that no one suggested to Smith that he
Âneed[ed] to hurry up and get Mrs. Jackson or Mr. Jackson out of that property
so that [the police] can get down there and search it again.ÂÂ  

Â 





[4]Thomas
testified his notes Âindicate a possible elimination,Â but he classified the
test as ÂinconclusiveÂ because the pistol ÂwasnÂt collected until well after
the offense dateÂ and Âthe firearm could have been altered between the time of
offense and time of collection.ÂÂ  Richard
Ernest, the defense expert, testified the .45 caliber pistol was Âwell worn,Â
but testified thousands of rounds would probably be needed to wear the rifling
out and it would be very unlikely for that many bullets to be fired in a month
and a half.Â  





[5]At
one point, Jackson claimed he was in Georgia when the offense was
committed.Â  Later, Jackson claimed he had
visited a cousin on the day of the offense.Â 
The cousin denied he had seen Jackson since Thanksgiving 2007.Â  JacksonÂs statements are contradicted by the
airline records.Â  In addition, Dana
Dessesaure, an employee at the daycare which cared for JacksonÂs children,
testified Jackson picked up his children around 2Â2:30 on the day of the
murder.Â  

Â 





[6]Francis
Jackson left her job at approximately 9:00 a.m. to take diapers to her
childrenÂs daycare.Â  Francis returned at
10:12 a.m., but left again at 10:56 a.m. to do field work for her company.Â  Although the field work should have only
taken half an hour and her lunch break was only one hour, she did not return
for two and a half hours.Â  After making a
call around 1:54 p.m., Francis left for the rest of the day to deal with a family
emergency.





[7]The
record contains no details concerning the similarity of this test to the
conditions to which the shell was exposed at the scene.





[8]Francis
had claimed to be purchasing diapers during her first absence from work on the
day of the pawn shop murder.Â  

Â 





[9]Jackson
also argues the State was required to corroborate the testimony of Roberson
under the accomplice-witness rule.Â  The
State fails to respond to JacksonÂs accomplice-witness argument.Â  In addressing this argument, we start by
pointing out that Roberson was not complicit in the offense being triedÂthe
pawn shop murderÂbut he was JacksonÂs accomplice in the extraneous offenseÂthe
Kroger robbery.Â  Separating the two
offenses for this analysis is important, because Roberson provided testimony
relevant to both the pawn shop murder and the Kroger robbery.Â  Because Roberson was not an accomplice in the
pawn shop murder, RobersonÂs testimony regarding the murder need not be
corroborated.Â  Because there is sufficient
corroboration of JacksonÂs involvement in the extraneous offense, we need not
decide whether RobersonÂs testimony as to the extraneous offense must be
corroborated.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Under
the accomplice-witness rule, one cannot be convicted on the testimony of an
accomplice unless that testimony is corroborated by other evidence tending to
connect the defendant with the offense charged.Â 
Tex. Code Crim. Proc. Ann.
art. 38.14 (Vernon 2005).Â  The test for
weighing the sufficiency of corroborating evidence is to eliminate from
consideration the accompliceÂs testimony and then examine the remaining
testimony and evidence to determine if there is evidence that tends to connect
the defendant with the commission of the offense.Â  Munoz
v. State, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); Hall v. State, 161 S.W.3d 142, 149 (Tex. App.ÂTexarkana 2005, pet.
refÂd).Â  To determine the sufficiency of
corroboration, we must view the corroborating evidence in the light most
favorable to the juryÂs verdict.Â  Gill v. State, 873 S.W.2d 45, 48 (Tex.
Crim. App. 1994).

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Roberson
was not an accomplice in the pawn shop murder.Â 
ÂCommission of a different ÂdownstreamÂ offense, even with knowledge of
the prior criminal act charged against the defendantÂ is insufficient to make a
witness an accomplice witness.Â  Tucker v. State, 689 S.W.2d 235, 237
(Tex. App.ÂEl Paso 1985, pet. refÂd).Â 
Although there is sufficient evidence independent of RobersonÂs
testimony that tends to connect Jackson to the pawn shop murder, Roberson was
not an accomplice to the pawn shop murder, and corroboration of RobersonÂs
testimony concerning the pawn shop murder was not required.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On
the other hand, Roberson was an accomplice as a matter of law in the Kroger
robbery, because he had been indicted for the Kroger robbery.Â  See
Goff v. State, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996); Badillo v. State, 963 S.W.2d 854, 857
(Tex. App.ÂSan Antonio 1998, pet. refÂd).Â 
None of the cases cited by Jackson involve witnesses who were
accomplices to an extraneous offense.Â 
ÂWhether the rule applies to accomplice witness testimony concerning
extraneous offenses properly proved by the State at the guilt-innocence stage
has not been resolved.ÂÂ  43 George E. Dix
& Robert O. Dawson, Texas Practice:
Criminal Practice and Procedure Â§ 31.253 (West 2001); see Rice v. State, 605 S.W.2d 895, 903 (Tex. Crim. App. [Panel Op.]
1980) (op. on rehÂg) (declining to decide issue).

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  If
the accomplice-witness rule were to apply to the extraneous offense, the State
would be required to establish sufficient corroboration of RobersonÂs testimony
to connect Jackson to the Kroger robbery.Â 
RobersonÂs testimony concerning the Kroger robbery was corroborated by
JacksonÂs admission to Blaylock that Jackson had committed that robbery, the
shell casing found at the Kroger store and matched to the gun found at
JacksonÂs house, and the DNA analysis conducted on a hat left at the scene of
the Kroger robbery by the suspects and containing DNA that did not exclude
Jackson, but did exclude 99.98 percent of others in the population.Â  The nonaccomplice evidence does not have to
directly link the accused to the crime, does not have to establish guilt beyond
a reasonable doubt, and need not prove all the elements of the alleged
offense.Â  Gill, 873 S.W.2d at 48; Munoz,
853 S.W.2d at 559.Â  The nonaccomplice
evidence tends to connect Jackson with the Kroger robbery.Â  The corroboration of the accomplice testimony
was sufficient as to the extraneous offense.





[10]While
the State contended that the hooded sweatshirt worn at the pawn shop was a
disguise, we do not find that contention compelling.





[11]The
State argues, because the defense impeached Blaylock with the evidence that he
received a $20,000.00 reward, the Kroger robbery was admissible to show
Blaylock was willing to testify concerning the Kroger robbery despite not
receiving a reward.Â  Alternatively, the
State argues the Kroger robbery was admissible to explain a typographical error
in the search warrant which authorized the third search of JacksonÂs residence.






[12]We
note that, on at least two occasions, the Texas Court of Criminal Appeals has
applied the Âgrave doubtsÂ analysis instead of the Âfair assuranceÂ
analysis.Â  See Burnett v. State, 88
S.W.3d 633, 637 (Tex. Crim. App. 2002); Ford
v. State, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002); see also Aguirre-Mata v. State, 125 S.W.3d 473, 487 (Tex. Crim.
App. 2003) (Holcomb, J., dissenting).Â 
Under this analysis, which is roughly equivalent to the Âfair assuranceÂ
analysis, the error is reversible if the court has Âgrave doubtsÂ about whether
an error did not affect the outcome.Â  See Burnett,
88 S.W.3d at 637; see also OÂNeal v.
McAninch, 513 U.S. 432, 434 (1995). Â ÂGrave doubtÂ means Âin the judgeÂs mind, the
matter is so evenly balanced that [the judge] feels himself in virtual
equipoise as to the harmlessness of the error.Â Â OÂNeal,
513 U.S. at 434; Burnett, 88 S.W.3d
at 637.Â  The Âgrave doubtsÂ analysis
would result in the same conclusion as the Âfair assuranceÂ analysis.Â  Despite the substantial evidence of guilt, we
entertain grave doubts concerning whether the evidence did have a substantial
or injurious influence on the jury.Â  While
the evidence of guilt favors a finding of harmless error, the character of the
erroneously-admitted evidence and its connection to the other evidence favors a
finding of harm.Â  Our balancing concludes
these factors are so evenly balanced that the decision regarding the
harmlessness of the error is in Âvirtual equipoise.ÂÂ  Because we have grave doubts concerning
whether the evidence did have a substantial or injurious influence, the error
in admitting the extraneous evidence resulted in harm.